**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
UNITED STATES OF AMERICA
                                Plaintiff,

                                                          **REPORT AND**
                                                          **RECOMMENDATION**

        - against -
                                                          09-CV-2484 (ARR) (JO)

WHITE-SUN CLEANERS CORP., et al.
                                Defendants.
--------------------------------------------------------X

**JAMES ORENSTEIN, Magistrate Judge:**

        The United States accuses defendants WSCC Cleaners Corporation ("WSCC") and its

president and owner Insun Yun ("Yun" or, collectively with WSCC, "White-Sun") of violating

their legal duties with respect to the handling and disposal of hazardous waste while operating a

dry-cleaning business in Queens, New York (the "Facility"). The government further alleges that

White-Sun violated a 2002 consent agreement with the federal Environmental Protection Agency

("EPA") and fraudulently transferred the business to defendant WWCleaners.com Corporation

("WWC") to avoid obligations under that agreement. The government seeks monetary and

injunctive relief against all three defendants pursuant to the terms of both the consent agreement

and the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, *et seq. See* Docket Entry

("DE") 1 (Complaint). The defendants did not respond to the Complaint, and the government

therefore seeks a default judgment. DE 4. Upon a referral from the Honorable Allyne R. Ross,

United States District Judge, DE 6, I now make this report and, for the reasons set forth below,

respectfully recommend that the court grant a default judgment in favor of the government

against all three defendants, award a total amount of $190,043.05 jointly and severally against all

three defendants, and issue an injunction requiring them to bring the subject facility into

compliance with all pertinent regulations and to certify such compliance.

I.      Background

        A.      Facts

        The following recitation of facts is drawn from the Complaint's uncontested allegations

and the uncontroverted documents submitted in support of the instant motion for default

judgment. The record includes the following documents:

| Docket Entry | Description | Abbreviated Form |
|---|---|---|
| DE 1 | Complaint | Complaint |
| DE 4 | Motion for Default Judgment | Motion |
| DE 5 | Declaration of Edward K. Newman | Newman Dec. |
| DE 10 | Supplemental Motion for Default Judgment | Supp. Mot. |
| DE 10-1 | Supplemental Declaration of Edward K. Newman | Newman Supp. Dec. |
| DE 10-1 at 42 | Newman Supp. Dec. Ex. 5 | White-Sun Report |
| DE 10-1 at 45 | Newman Supp. Dec. Ex. 6 | KY Report |
| DE 10-2 | Declaration of EPA Inspector Carl F. Plössl ("Plössl") | Plössl Dec. |
| DE 10-2 at 22 | Plössl Dec. Ex. 1 | Consent Agreement |
| DE 10-2 at 39 | Plössl Dec. Ex. 2 | Yun Letter |
| DE 10-2 at 50 | Plössl Dec. Ex. 4 | EPA Form |
| DE 10-2 at 56 | Plössl Dec. Ex. 5 | Han Letter |
| DE 10-2 at 58 | Plössl Dec. Ex. 6 | April 2004 Notice |
| DE 10-2 at 72 | Plössl Dec. Ex. 7 | Han Notice Response |
| DE 11 | Corrected Proposed Order | Proposed Order |

        White-Sun operated the Facility located at 47-38 through 47-46 34th Street in Long

Island City as a dry-cleaning business. Complaint ¶¶ 8-9.[1] The Facility's dry-cleaning machines

use tetrachloroethylene, otherwise known as perchloroethylene (or "perc"), a hazardous waste

product that is known to cause respiratory distress and sore throats and is also a suspected

carcinogen. Id. ¶¶ 2, 23; Plössl Dec. ¶ 10. Perc is a relatively volatile substance that evaporates

easily into the air. Plössl Dec. at ¶ 9.

_____

[1] WSCC operates under the business names White & White Cleaners, Leather Man, Sun
Cleaners, and Sun Cleaners of America. WWC does business as KY 34th Street Corporation
("KY"). In the submissions and various exhibits, the parties refer interchangeably to the latter
defendant as KY and WWC.  For clarity, I will replace all references to KY with WWC.

On August 31, 2000, the EPA inspected the Facility and found problems in the way White-Sun generated and handled hazardous waste containing perc. Complaint ¶ 33. Many containers containing hazardous waste did not bear markings sufficient to identify their contents as such and some were not closed as required; moreover, White-Sun did not have a hazardous waste permit as required. *Id.* ¶¶ 34, 35.

On October 18, 2000, and again on December 18, 2000, the EPA sent White-Sun notices setting forth violations it found and requesting information about hazardous waste management at the Facility. The second notice warned that failure to respond would subject WSCC to a civil penalty. White-Sun never provided the information requested. In response, the EPA issued an Administrative Complaint seeking civil penalties and injunctive relief. White-Sun filed answers to the Administrative Complaint and later entered into a Consent Agreement and Final Order with the EPA resolving the matter. Complaint ¶¶ 36-43; Plössl Dec. Ex. 1 (copy of Consent Agreement). Yun signed the Consent Agreement "for himself and as President and Agent for All Respondents." *Id.* at 14.

The Consent Agreement imposed a number of obligations on White-Sun. It was required to submit a written report documenting compliance with the applicable regulations; to implement a supplemental environmental program ("SEP"), including installation of new machines and the use of different chemicals; to submit a variety of reports to the EPA about the SEP's progress; and to pay a civil penalty of $10,800 in two equal installments of $5,400 due on April 2, 2002, and April 2, 2003, respectively. *Id.* at 4-5, 8-10. The Consent Agreement also provided for specific remedies in the event White-Sun failed either to pay the monetary penalty or to implement and report on the SEP. *Id.* at 5-6, 11-12.

In compliance with the Consent Agreement, White-Sun leased and installed a non-perc machine. In other respects, however, White-Sun did not discharge its obligations. It did not submit reports to the EPA either about the operation or maintenance of the new machine or about its implementation of the SEP. Moreover, it paid only part of the monetary penalty: although it timely made the first payment of $5,400 on April 2, 2002, it did not make the second. Instead it made a payment of $500 on June 19, 2002, and has paid nothing since then. Thus, White-Sun has paid a total of $5,900, leaving a shortfall of $4,900. *See* Complaint ¶¶ 55-61.

On January 8, 2004, the EPA again inspected the Facility and found several instances of improperly labeled containers contaminated with perc. Complaint ¶¶ 45-46; Plössl Dec. Ex. 6 (copy of April 2004 Notice). By letter dated April 30, 2004, addressed to Yun, the EPA detailed the violations it found during the January inspection and requested that Yun answer a series of questions relating to those violations. Plössl Dec. Ex. 6.

In a letter dated May 4, 2004, WSCC's long-time secretary Jessica Han ("Han") responded to the EPA's notice by stating that WSCC was no longer in business. Han further advised that she was the owner of WWC, which had succeeded WSCC as the Facility's leaseholder. She also submitted forms requesting an EPA identification number and identifying the Facility as a RCRA Subtitle C Site; the latter submission stated that WWC had been the owner of the site since February 1, 2004. Complaint ¶¶ 65-66; Plössl Dec. Ex. 5 (copy of Han Letter) & Ex. 4 (copy of EPA Form).

Yun also responded to the EPA in a letter dated August 9, 2004. He claimed that because he was no longer an employee of WSCC, he was unable to pay the remainder of the penalty owed under the Consent Agreement. He further informed the EPA that WSCC had been sold "as is" in April 2004 to Han. According to the bill of sale, WSCC sold various tangible assets (dry-

cleaning, pressing, and laundry equipment; vehicles, office furniture, and computer hardware and software) to WWC in exchange for WWC's payment of WSCC's obligations to third parties, in the total amount of $100,000. *Id.* ¶¶ 63, 113. WSCC continued to own the real property and building housing the Facility until December 10, 2004, when it was sold to Elizabeth Kumbok Lee and Peter Jungho Lee. *See* Complaint ¶¶ 63, 65-66, 113; Plössl Dec. ¶ 53 & Ex. 2 (copy of Yun Letter).

Notwithstanding WSCC's sale to WWC, the Facility maintained the same management, personnel, physical location, assets, and general business operations. Yun continued to perform services at the Facility as an operator and manager; during inspections on January 8, 2004, August 10, 2004, and May 8, 2007, he escorted the EPA's Inspector Plössl, discussed the Consent Agreement, and replied to questions about the operation of the Facility, including waste handling, storage, and disposal. During the 2007 inspection, Yun continued to manage the dry-cleaning operations at the Facility; the employees reported to him and he demonstrated a working knowledge of the Facility's equipment and finances, including the volume of business for at least the period of May to November 2006. Further suggesting that the transfer from WSCC to WWC was a sham, Han at one point asked Plössl not to tell the Facility's employees about the change in ownership. Han said she was pretending that Yun still owned and ran the business to make it easier to run. *See* Plössl Dec. ¶¶ 54, 68, 72, 74.

By letter August 10, 2004, Han again asserted that WSCC no longer operated the business and that WWC operated the Facility. Han attempted to respond to the violations the EPA identified at the January 2004 inspection; all of her answers indicated that Yun was the source of the hazardous waste-related information. Complaint ¶¶ 70-71; Plössl Dec. Ex. 7 (copy of Han Notice Response).

During the August 10, 2004 inspection, the EPA discovered perc-contaminated decontamination equipment, two dry cleaning machines taken out of service without a determination as to whether they contained hazardous waste, and perc waste not being managed as hazardous waste. During the May 8, 2007 inspection, the EPA found perc-contaminated wastewater and other perc-contaminated waste that was not properly managed as hazardous waste. The out-of-service machines observed during the previous inspection were still at the Facility, and multiple containers containing perc were neither labeled nor properly closed. Complaint ¶¶ 47-54.

B.    Proceedings

On June 10, 2009, the government filed a Complaint asserting eight claims for relief. In each of the first four claims, the government asserts claims against all three defendants under RCRA. The first claim alleges that the defendants violated the statute by failing to determine whether the Facility's solid waste was hazardous, Complaint ¶¶ 75-82; the second asserts that they did so by failing to close containers storing hazardous waste, *id*. ¶¶ 83-85; the third relies on their failure to label containers of hazardous waste, *id*. ¶¶ 86-89; and the fourth contends that they stored hazardous waste without a permit, *id*. ¶¶ 90-93. The remaining four claims are predicated on the Consent Agreement. The fifth claim alleges that all three defendants violated the agreement by failing to implement the SEP and comply with reporting requirements, *id*. ¶¶ 94-96; and the sixth claim contends that they did so by failing to make full payment of the civil penalty, *id*. ¶¶ 97-101. The seventh and eights claims assert that the sale of WSCC's assets to WWC should be voided because it was designed to evade White-Sun's obligations under the Consent agreement, in violation of the Federal Debt Collection Procedures Act, 28 U.S.C. § 3304, *et seq*. ("FDCPA"). Specifically, the government claims the transfer was improper both

because it was designed to hinder, delay, or defraud the EPA in its effort to secure compliance, *id.* ¶¶ 102-15 (seventh claim); and because the WWC deliberately sold its assets for inadequate consideration and left itself insolvent, *id.* ¶¶ 116-21 (eighth claim).

The EPA served the Complaint on each defendant on July 10, 2009. DE 3. None of the defendants responded. Newman Dec. ¶ 6. On November 11, 2009 (after some prompting by the court, *see* DE 2), the government moved for a default judgment. DE 4. In separate docket entries dated January 12 and 13, 2010, the Clerk noted the defaults. Shortly thereafter, Judge Ross referred the government's motion to me. DE 6. I afforded the government an opportunity to submit any additional written materials in support of its request for relief. Order dated January 19, 2010. On March 11, 2010, the government filed its supplemental materials, including declarations by its counsel and EPA Inspector Plössl, as well as several exhibits. DE 10.

At the same time, the government submitted the Proposed Order in which it specified the remedies it now seeks. DE 11. Those remedies include a total monetary award of $203,483.00, as well as injunctive relief. Specifically, as to the latter, the government asks the court to order the defendants to determine whether any perc-contaminated waste at the Facility is hazardous; to ensure containers containing perc are properly marked and kept closed (except when waste is being added or removed); to obtain a hazardous waste permit or comply with conditions allowing the facility to be exempt from obtaining such a permit; to provide timely and complete responses to any requests for information concerning compliance with Subtitle C of the RCRA; and to certify compliance with Subtitle C of the RCRA within 30 days of the court's order. *Id.*

II.     <u>Discussion</u>

A.     <u>Default</u>

When a defendant defaults, the court must accept as true all well-pleaded allegations in the complaint, except those pertaining to the amount of damages. Fed. R. Civ. P. 8(b)(6); *see Finkel v. Romanowicz*, 577 F.3d 79, 83 n.6 (2d Cir. 2009) (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992)). The fact that a complaint stands unanswered does not, however, suffice to establish liability on its claims: a default does not establish conclusory allegations, nor does it excuse any defects in the plaintiff's pleading. With respect to liability, a defendant's default does no more than concede the complaint's factual allegations; it remains the plaintiff's burden to demonstrate that those uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action. *See, e.g.*, *id*. at 84; *Directv, Inc. v. Neznak*, 371 F. Supp. 2d 130, 132-33 (D. Conn. 2005) (denying default judgment on several claims based only on conclusory allegations which lacked a sufficient factual basis for a finding of liability); *see also Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 69 (2d Cir. 1971) (default-based liability is established by "well-pleaded allegations in a complaint"), *rev'd on other grounds*, 409 U.S. 363 (1973); *Greyhound Exhibitgroup*, 973 F.2d at 159 (complaint's assertion of proximate cause necessary for finding of liability must be "properly alleged"); *Levesque v. Kelly Commc'ns, Inc.*, 1993 WL 22113, at *5 (S.D.N.Y. Jan. 25, 1993) ("the Court must be satisfied initially that the allegations of the complaint are 'well-pleaded'") (citing *Trans World Airlines*, 449 F.2d at 63).

If the defaulted complaint suffices to establish liability, the court must conduct an inquiry sufficient to establish damages to a "reasonable certainty." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999) (quoting *Transatl. Marine Claims Agency, Inc. v.*

*Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997)). Detailed affidavits and other

documentary evidence can suffice in lieu of an evidentiary hearing. *Action S.A. v. Marc Rich &*

*Co.*, 951 F.2d 504, 508 (2d Cir. 1991); *Credit Lyonnais*, 183 F.3d at 155. Upon the record before

me, I have declined to convene an evidentiary hearing and make the instant report and

recommendations on the basis of the submitted documents. *See Action S.A.*, 951 F.2d at 508;

*Transatl. Marine Claims Agency*, 109 F.3d at 111.

      B.      <u>The First Four Claims For Relief</u>

          1.      <u>The Complaint Establishes Statutory Violations</u>

      The RCRA establishes a comprehensive federal regulatory program for the management

of hazardous waste. Pursuant to Section 3006 of the RCRA, 42 U.S.C. § 6926, the EPA

authorized New York State to administer and enforce a hazardous waste management program in

lieu of the federal program. The EPA is authorized to enforce the regulations comprising the

New York State program, Section 3008 of the RCRA, 42 U.S.C. § 6928; 40 CFR 272.1651(b),

which are incorporated by reference as part of the federal hazardous waste management program

under Subtitle C of the RCRA, 42 U.S.C. § 6921, *et seq.* Perc has been designated as a hazardous

waste. 40 C.F.R. § 302.4; 6 NYCRR § 371.3(e) (toxic at concentrations greater than 0.73

milligram per liter); *id.* § 371.4(b)(1) (hazardous as a spent halogenated solvent); *ABB Indus.*

*Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 354 (2d Cir. 1997).

      New York's regulatory regime imposes several duties relevant to the government's claims

here. First, a person who generates solid waste must determine if that waste is a hazardous waste.

Second, containers holding hazardous waste must always be closed during storage, except when

it is necessary to add or remove waste. Third, containers holding hazardous waste must be

marked with the words "Hazardous Waste" and with other words identifying their contents. *See* 6

NYCRR §§ 372.2(a)(2), 373-2.9(d)(1), (3). The defendants' default establishes the truth of the Complaint's allegations that, at each of the inspections, the EPA found violations of each of the provisions described above. Accordingly, the government has established liability as to the Complaint's first three counts.

Additionally, the regulations state that "[n]o person shall operate an existing hazardous waste management facility without a permit." *Id*. § 373-1.2(a). A "hazardous waste management facility" is one that treats, stores, or disposes of hazardous waste." *Id.* § 370.2(b)(89). The Complaint asserts that the Facility "stored" hazardous waste material by accumulating it; "storage" means the holding of hazardous waste on a temporary basis. *Id.* §§ 373-1.2(d), 370.1(b)(183). Although a generator of hazardous waste may be exempt from the permit requirements for waste generated on-site if it properly labels its containers as "Hazardous Waste" and marks clearly and makes visible for inspection the date that each period of hazardous waste accumulation began in that container, *id.* § 373-1.1(d)(1)(iii)(c)(2), during each inspection of the Facility, the EPA found improperly labeled containers and containers on which accumulation dates were not noted. Complaint ¶¶ 91-92. The Facility was therefore not subject to any exemption from the permit requirement; nor did the defendants ever obtain a permit. *See id*. Therefore, Count Four properly alleges a violation of 6 NYCRR § 373-1.2(a) and of the RCRA.

2.    Each Defendant Is Liable For All Statutory Violations

The Complaint asserts that all the defendants are jointly and severally liable for each violation of the RCRA, claiming that "[d]uring all relevant times" Yun, WSCC, and WWC were owners and operators of the Facility, and noting that under Section 1004 of the RCRA, 42 U.S.C. § 6903(15), each qualified as a "person" liable for the violations. As explained below, I agree that each defendant bears responsibility for each violation.

The RCRA states that "[a]ny person who violates any requirement of [the RCRA] shall be liable to the United States for a civil penalty[.]" 42 U.S.C. § 6928(g). The government is correct that all three defendants are "persons" within the statute's meaning, as the relevant definition includes both individuals and corporations. *See* 42 U.S.C. § 6903(15); 6 NYCRR § 370.2(b)(141).

A "person who violates" the requirements of the RCRA must be a person or entity responsible for compliance with the rules promulgated under its authority. Those rules apply to generators of hazardous waste and operators and owners of hazardous waste management facilities. *See* 6 NYCRR § 372.2(a)(2) (generators of hazardous waste); *id.* § 373-2.9(d)(1), (3) (owners and operators of hazardous waste management facilities); *id.* § 373-1.2(a) (owners and operators). The New York regulations define "operator" as "the person responsible for the overall operation of the facility" and "owner" as "the person who owns a facility or part of a facility." *Id.* § 370.2(b)(136), (137). Generator is defined as any person "whose act or process produces hazardous waste[.]"*Id.* § 370.2(b)(83).

A defendant may incur liability as an owner, operator, or generator if that person or entity was personally involved in or directly responsible for corporate acts that violate the RCRA. *See*, *e.g.*, *United States v. Ne. Pharm. & Chem. Co.*, 810 F.2d 726, 740 (8th Cir 1986) ("[I]mposing liability upon only the corporation, but not those corporate officers and employees who actually make corporate decisions, would be inconsistent with Congress' intent to impose liability upon the persons who are involved in the handling and disposal of hazardous substances.") (citations omitted); *United States v. Carr*, 880 F.2d 1550, 1554 (2d Cir. 1989) (Under CERCLA and the Clean Water Act, liability "does not apply only to owners and operators" but also "extend[s] to any person who is 'responsible for the operation' of a facility"); *United States v. JG-24, Inc.*, 331

F. Supp. 2d 14, 72, 74-75 (D.P.R. 2004) (individual found liable as a direct proprietor, an alter ego of the corporation that owned and operated the site, and as the person responsible for making decisions about compliance with environmental regulations).

    a.  WSCC

  The Complaint establishes that WSCC is liable for the RCRA violations observed in January and August of 2004. WSCC was both an "owner" and an "operator" during the January 2004 inspection; it owned the Facility and was also the corporate entity that operated the business conducted there. Having sold the business to WWC in February or April, during the August 2004 inspection, WSCC no longer qualified as an operator; however, it was still the owner of the Facility until it sold the real estate to a third party in December 2004. If the record included no further information, there would be no reason to impose liability on WSCC for the violations observed in 2007. But, as discussed below in connection with the government's claims under the FDCPA, the defendants' default serves to admit all of the allegations necessary for the court to void the transfer of WSCC's assets to WWC on the ground that the transfer was designed with the fraudulent intent to evade its obligations under the Consent Agreement. Those same reasons suffice to show that WSCC remained the de facto owner and operator of the Facility at all relevant times, including during the inspections that took place after the sale to WWC. Accordingly, I recommend that the court hold WSCC jointly and severally liable for all violations of the RCRA observed during all of the EPA's inspections.

    b.  Yun

  The Complaint establishes Yun's liability for the violations observed at all three inspections. Yun was the owner and manager of the Facility during the January 2004 inspection and an owner during the August 2004 inspection. After selling the business to WWC, Yun

continued in his role as a manager who oversaw the Facility's hazardous waste management program. Yun's active management of the Facility's hazardous waste during the 2007 inspection gives rise to liability as an operator and generator although he no longer had an ownership interest in the Facility or business at that time. As the Supreme Court stated in analogous circumstances in a case under CERCLA:

> [A]n operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*United States v. Best Foods*, 524 U.S. 51, 66-67 (1998). As of 2007, Yun continued to manage the dry-cleaning operations at the Facility and the employees reported to him. During the inspection that year, Yun escorted the EPA inspector, discussed the Consent Agreement, and replied to questions about the operation of the Facility, including waste handling, storage, and disposal.

          c.    <u>WWC</u>

There is no question that WWC is liable for the August 2004 and 2007 violations; by Han's own assertion, WWC owned and operated the dry-cleaning business at the Facility from as early as February 2004. EPA Site Identification Form. The closer question is whether WWC is also liable for the violations observed in January 2004, before it was the owner or operator of record. I conclude that it is. Under New York law,

> a buyer of a corporation's assets will be liable as its successor if: "(1) it expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations."

*New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006) (quoting *Schumacher v. Richards Shear Co., Inc.*, 59 N.Y.2d 239, 245 (1983); citing *N. Shore Gas Co. v. Salomon Inc.*, 152 F.3d 642, 651 (7th Cir. 1998) (same under "traditional common-law principles")).

The defendants' default establishes that the transfer to WWC was entered into fraudulently to escape the obligations of White-Sun and Yun under the Consent Agreement and Final Order. *See* Complaint ¶¶ 4, 63-74. Accordingly, WWC bears successor liability for the violations observed in 2004.

### 3. Civil Penalties

Entry of a default judgment constitutes admission of all well-pleaded allegations, except those pertaining to the amount of damages. *Credit Lyonnais*, 183 F.3d at 155; Fed. R. Civ. P. 8(d). The plaintiff bears the burden of proving his or her entitlement to the amount demanded. *Greyhound Exhibitgroup*, 973 F.2d at 158 (citing *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974)). The government is seeking civil penalties pursuant to Section 3008(g) of the RCRA, which provides:

> Any person who violates any requirement of this subtitle shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each such violation. Each day of such violation shall, for purposes of this subsection, constitute a separate violation.

42 U.S.C. 6928(g).

To assess an appropriate civil penalty, the court may consider the statutory factors, including the seriousness of the violation and any good faith efforts to comply with the applicable requirements. *Id.* § 6928(a)(3). Additionally, courts consider "the harm caused by the violation, any economic benefit derived from noncompliance, the violator's ability to pay, the government's conduct, and the clarity of the obligation involved." *United States v. Ekco Housewares*, 62 F.3d 806, 814 (6th Cir. 1995) (citation omitted). The assessment of civil

penalties is committed to the informed discretion of the district court. *Id.* (citations omitted). One important purpose of the civil penalty scheme is deterrence, including specific deterrence to prevent the violator from any further noncompliance, and general deterrence of future violations by others in the regulated community. *Ekco Housewares*, 62 F.3d at 816; *United States v. Phelps Dodge Industries, Inc.*, 589 F. Supp. 1340, 1358-59, 67 (S.D.N.Y. 1984).

The statutory factors – the seriousness of the violation and the extent to which the violator made good faith efforts to comply with the law – both support an award of a substantial penalty under the circumstances here. The violations are serious in light of the RCRA's goal to "reduce the generation of hazardous waste and to ensure the proper treatment, storage and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996) (quoting 42 U.S.C. § 6902(b)). The defendants failed to determine whether the waste generated at the Facility was hazardous or obtain required permits; such violations threaten to eviscerate a central goal of the RCRA, as receipt and compliance with a permit is at the core of the federal hazardous waste management system. *See United States v. Heuer*, 4 F.3d 723, 730 (9th Cir. 1993) ("It is fundamental that an entity which performs a hazardous waste activity for which a permit is required under RCRA may not legally perform that activity unless it has a permit for the relevant activity."). Further, the defendants' failure to properly label and contain the perc waste generated at the Facility is a serious violation because the substance is demonstrably dangerous to human health, potentially deadly, and easily dispersed if not properly handled. Finally, the record in this case cannot support a finding that the defendants made a good faith attempt to comply with the law. To the contrary, the defendants failed to cure the recurring

violations over an extended period of roughly seven years, notwithstanding the requirements of the Consent Agreement and the EPA's subsequent notices of violations.

The non-statutory factors also favor the imposition of a substantial penalty. The obligations at issue were clear in this case; not only were they plainly detailed in the federal statute and New York regulations, but the EPA also repeatedly reminded the defendants of their obligations in the Consent Agreement, subsequent notices of violations, and in-person inspections of the Facility. Finally, the government asserts that the penalty it proposes is not out of proportion with the defendants' apparent ability to pay, citing a Dun and Bradstreet report which states that in 2009, WSCC's annual sales were $1,149,950 and WWC's annual sales $2,500,000. *See* Newman Supp. Dec. Exs. 5 & 6.

The maximum penalty for violations of 42 U.S.C. § 6928 was adjusted by regulation to account for inflation; the maximum from January 30, 1997 through March 15, 2004 was $27,500 per day; $32,500 per day for the period from March 16, 2004 through January 12, 2009, $32,500; and $37,500 per day since January 13, 2009. 40 C.F.R. § 19.4. The maximum penalties available under the facts of this case thus approach $100 million. The government understandably seeks a much lower civil penalty: in its memorandum of law it asks for an award of $150,000. Supp. Mot. at 19-31. The government does not explain how it arrived at that particular figure aside from asserting that it reflects the EPA's Penalty Policy – which it did not provide to the court. The government's memorandum cites Plössl's declaration in support of its request, but does not explain why the amount it requests exceeds the surprisingly precise figure of $146,213 that Plössl actually specifies as the appropriate penalty pursuant to his agency's policy. *See* Plössl Dec. ¶ 64. Plössl likewise fails to provide any calculation or explanation as to how he arrived at

the penalty amount he endorses, other than by a conclusory reference to the EPA policy that he has not provided to the court. *See id.*

Notwithstanding the lack any explanation of its methodology, I conclude that Plössl's figure of $146,213 – which reflects a daily penalty under fifty dollars – is reasonable in light of all the relevant factors, each of which weigh in favor of a substantial penalty. I note, moreover, that each defendant has had a full opportunity to contest every aspect of the government's request for relief, and each has declined to do so. I therefore recommend that the court award a civil penalty for the RCRA violations set forth in the Complaint's first four claims for relief in the amount of $146,213, jointly and severally against all defendants.

4. <u>Injunctive Relief</u>

The government requests that the court enjoin the defendants to come into compliance with the RCRA and pertinent New York State regulations. Specifically, the government asks the court to compel the defendants to determine immediately whether any perc-contaminated solid wastes at the Facility are hazardous; to ensure that containers containing perc-contaminated material are closed, except when hazardous waste is being added or removed; to label containers of perc-contaminated hazardous waste; to comply with conditions for hazardous waste storage until they obtain a permit for such storage; to provide timely and complete responses to any requests for information concerning compliance with Subtitle C of the RCRA; and to certify compliance with the relevant rules and regulations within 30 days of the date judgment is entered. Supp. Mot. at 34-35; Proposed Order at 3-4.

The remedies available for a violation of the RCRA include "a temporary or permanent injunction." 42 U.S.C. § 6928(a)(1). To obtain an injunction, the government must establish that it is entitled to relief under the statute and that it otherwise satisfies the requirements for an

injunction. *See Huntington v. Marsh*, 859 F.2d 1134, 1143 (2d Cir. 1988) ("injunctive relief does not follow automatically upon a finding of statutory violations, including environmental violations"). The government has plainly satisfied the first requirement; the defendants' defaults have established that they are liable for various periods during which the EPA documented violations of the RCRA and New York regulations at the Facility.

To satisfy the requirements for an injunction, the government must also establish irreparable harm and the absence of an adequate remedy at law. *See Coalition for a Liveable West Side v. New York City Dep't of Envtl. Prot.*, 1998 WL78285, *4 (S.D.N.Y. Feb. 24, 1998) (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542, 546 n.12 (1987); *Huntington*, 884 F.2d at 651); *see also United States v. Marine Shale Processors*, 81 F.3d 1329, 1360 (5th Cir. 1996) (remanding the government's application for a permanent injunction for violations of the RCRA to the district court to make findings "as to willfulness, risk of danger to the public interest, balance of the equities, irreparable harm, [and] adequacy of legal remedies"). To that end, the government has alleged that the defendants' failure to make hazardous waste determinations or label or store perc-contaminated waste properly creates a substantial danger that people will be exposed to perc, a suspected carcinogen that is known to cause respiratory distress and sore throats in humans. Further, the history of this case makes clear that civil penalties have not sufficed in the past to deter these defendants from continuing to ignore their obligations under the RCRA. I therefore conclude that the government has met its burden, and as a result I respectfully recommend that the court grant the government's request for injunctive relief.

C.      The Fifth and Sixth Claims For Relief

        1.      Liability

The defendants' default establishes the truth of the Complaint's allegations to the effect that WSCC voluntarily entered into a valid and binding Consent Agreement, and that it then violated its obligations both with respect to the payment of civil penalties and with respect to agreements to implement and report on the SEP. As a result, the government is plainly entitled to a finding of liability against WSCC as to its fifth and sixth claims for relief.

The government is likewise entitled to such a finding as to Yun, who signed the agreement not only on behalf of WSCC, but also explicitly in an individual capacity. Actions to enforce settlement agreements are contract actions which are generally governed by state law. *LaBarbera v. Dasgowd, Inc.*, 2007 WL 1531895, at *2 (E.D.N.Y. May 22, 2007). Under New York law, an officer will not be personally liable for the obligations of a corporation absent clear and explicit evidence of the agent's intention to substitute or add his personal liability for, or to, that of his principal. *Savoy Record Co. v. Cardinal Export Corp.*, 15 N.Y.2d 1, 4 (N.Y. 1964). Relevant factors to determine the agent's intent to be bound include: "the length of the contract, the location of the liability provision(s) in relation to the signature line, the presence of the signatory's name in the agreement itself, the nature of the negotiations leading to the contract, and the signatory's role in the corporation." *See, e.g.*, *Israel v. Chabra*, 537 F.3d 86, 97 (2d Cir. 2008) (citing *Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity Fund v. Lollo*, 35 F.3d 29, 35 (2d Cir. 1994)). Yun indicated that he intended to be bound personally by signing the Consent Agreement on behalf of himself and as the president and agent of WSCC. Further, Yun signed the Consent Agreement in full settlement

of an administrative proceeding in which he was named in his individual capacity as a respondent.

The government is also entitled to a finding that WWC is liable for violations of the Consent Agreement by virtue of its successor liability. As noted above, one basis for holding a successor corporation liable for the obligations of its predecessor is if the underlying transaction was entered into fraudulently to enable the predecessor to escape such obligations. *See Nat'l Serv. Indus.,* 460 F.3d at 209; *Am. Buying Ins. Services, Inc. v. S. Kornreich & Sons, Inc.*, 944 F. Supp. 240, 249 (S.D.N.Y. 1996); *Schumacher*, 59 N.Y.2d at 245.[2]

To satisfy the fraudulent purpose exception, a creditor (as the government is here) may rely on "badges of fraud," which are circumstances that accompany fraudulent transfers so often that their presence gives rise to an inference of intent. *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 934-35 (S.D.N.Y. 1995) (citing *Marine Midland Bank v. Murkoff*, 508 N.Y.S.2d 17, 21-22 (App. Div. 1986)). Such factors include (1) a close relationship among the parties to the transaction; (2) a secret and hasty transfer not in the usual course of business; (3) inadequacy of consideration; (4) the transferor's knowledge of the creditor's claim and the transferor's inability to pay it; (5) the use of dummies or fictitious parties; and (6) retention of control of property by the transferor after the conveyance. *MFS/Sun Life*, 910 F. Supp. at 935 (citations omitted); *Shelly v. Doe*, 671 N.Y.S.2d 803, 806 (App. Div. 1998).

---

[2] The government asserts that successor liability is available against WCC not only because its purchase of WSCC was fraudulent, but also on the related theories of de facto merger and mere continuation. Determining the validity of the government's position under each of the latter two theories requires the court to consider a number of factors, some of which, under the circumstances of this case, arguably favor the defendants. Accordingly, I respectfully recommend that the court base its decision on a finding that the sale of WSCC to WWC was fraudulent, and treat the remainder of the government's arguments for successor liability as moot.

The Complaint's allegations, as admitted by the defendants' default, establish several such indicia of fraud here. Han and Yun clearly had a previous relationship – Han had been a secretary in WSCC's office for a number of years. Moreover, she asked Plössl not to tell the employees about the change in ownership because she was pretending that Yun still owned and ran the business to make it easier to run. Yun retained control of the business; he continued to manage the Facility and the employees reported to him. Yun knew about his obligations under the Consent Agreement; in an August 2004 letter to the EPA, he represented that he was unable to fulfill them because he was no longer employed by WSCC. I therefore respectfully recommend that the court find WWC, as well as both of its co-defendants, liable on the fifth and sixth claims for relief.

        2.     <u>Damages</u>

        a.     <u>Failure To Pay The Settlement Amount</u>

The Consent Agreement required White-Sun to pay a penalty of $10,800 in two equal installments, with the first payment of $5,400 due by April 2, 2002, and the second due by April 2, 2003. *See* Consent Agreement at 5. After timely making the initial payment as agreed, White-Sun paid an additional $500 on June 19, 2002 and has paid nothing since. Complaint ¶ 60. White-Sun therefore owes a remaining balance of $4,900, which was due on April 2, 2003.

White-Sun's failure to complete its payments on time triggers a stipulated penalty of $2,000. Consent Agreement at 5. Additionally, the Consent Agreement provides for the assessment of interest on the overdue penalty ($4,900) at the annual rate established by the Secretary of the Treasury pursuant to 31 U.S.C. § 3717. *Id.* The Secretary of Treasury set an annual interest rate of two percent, effective from January 1, 2003 to December 31, 2003. 67 Fed. Reg. 65187 (Oct. 23, 2002). That rate remains fixed for the duration of indebtedness. 31

U.S.C. § 3717(c). The due date was April 2, 2003, and the earliest date on which the court can enter judgment in accord with the instant recommendation (allowing time for objections) is March 28, 2011, resulting in a period of 2,917 days, or approximately 7.99 years. Applying the two percent annual interest rate to a principal amount of $4,900.00 over that period yields a total interest amount of $783.02.[3]

The Consent Agreement further provides for a "handling charge" of $15 for each 30-day period, or any portion thereof, following the due date in which the balance remains unpaid. Consent Agreement at 5-6. As of the earliest date of a judgment that adopts my recommendations, 98 such periods (the last being a partial period) will have elapsed since the due date for White-Sun's second installment payment. Thus, the terms of the Consent Agreement entitle the government to a handling charge for 98 periods, or $1,470.

Finally, the Consent Agreement provides for the assessment of an additional penalty of six percent per year on any principal amount not paid within 90 days of the due date, or by July 1, 2003. Consent Agreement at 6. A total of 2,827 days will have passed from July 1, 2003, through March 28, 2011, or approximately 7.745 years. Applying the six percent annual penalty rate to a principal amount of $4,900.00 over the latter period yields a total penalty amount of $2,277.03.

In sum, if the court agrees that the defendants are liable under the government's Sixth Claim for Relief, I respectfully recommend that the court award the government a total of $11,430.05, consisting of the $4,900.00 remaining balance on the original penalty; a stipulated

---

[3] The government, calculating interest through March 11, 2010, asserts that the interest due pursuant to 31 U.S.C. § 3717 should be $1,688. In doing so, it does not reveal its calculations or methodology, and I am unable to replicate it. The interest I calculate through March 11, 2010, using the same methodology as above, is $680.31.

penalty of $2,000.00; interest in the amount of $783.02 on the original overdue penalty; a handling charge of $1,470.00; and an additional penalty of $2,277.03.

b.    Failure To Implement The SEP

The government seeks both a stipulated penalty and an interest award for the defendants' failure to comply with the reporting requirements of the SEP. Consent Agreement at 8-12. In support of its request for damages, the government cites Plössl's declaration, which states based on personal knowledge that Yun did not make the required documents and reports available for inspection following the Consent Agreement. Plössl Dec. ¶¶ 36, 48. Plössl first observed this violation on January 8, 2004, *id.* at ¶ 36, and it appears that the violation was never remedied – the EPA never received any of the required reports required by the SEP, *id.* at ¶ 48.

The Consent Agreement provides that any failure to comply with the SEP's reporting requirements will subject White-Sun to a stipulated penalty of $1,000 per day for violations lasting for more than 31 days, accruing from the first day of non-compliance and through the date of completion of the required reports. Consent Agreement at 12 ¶ 26. The government's request for relief under this provision, in addition to the amounts owed based on White-Sun's failure to pay the full monetary settlement amount, is not unduly duplicative: the agreement is explicit that "[s]imultaneous penalties shall accrue for separate violations of" its requirements. *Id*.

Noting that a penalty of $1,000 per day would yield an unreasonably high figure, the government is seeking a reduced penalty of $32,400, plus interest on that sum, accruing from the effective date of the Consent Agreement. Supp. Mot. at 33. That figure does not appear to have been chosen arbitrarily: the Consent Agreement credits that amount to White-Sun as consideration for its agreement to implement the SEP, and similarly specifies that amount as a

penalty in the event White-Sun fails to install certain EPA-approved equipment. Consent Agreement at 6 ¶ 7 & 11 ¶ 24(i). Under these circumstances, the government's request for a penalty of $32,400 (rather than the much higher amount it could demand) seems eminently reasonable, and I respectfully recommend that the court grant it.

However, I recommend that the court decline to award the interest the government seeks on this penalty. Unlike other penalty provisions in the Consent Agreement, the penalty provision the government invokes based on White-Sun's failure to implement the SEP does not call for an award of interest. *See* Consent Agreement at 12 ¶ 26. Accordingly, if the court agrees that the defendants are liable under the government's Fifth Claim for Relief, I respectfully recommend that the court award the government damages only in the amount of $32,400.00.

D.      The Seventh And Eighth Claims For Relief

In its final two claims for relief, the government seeks to void the sale of WSCC's assets to WWC to the extent necessary to satisfy the monetary awards on the preceding claims. The two claims set forth independent bases for such relief under separate provisions of the FDCPA. Specifically, the Seventh Claim for Relief one asserts that the transfer was fraudulent as to the government because it was done with the actual intent to delay, hinder, or defraud the United States as a creditor of WSCC. See Complaint ¶¶ 102-15; 28 U.S.C. § 3304(b)(1)(A). The Eighth Claim for Relief asserts that the transfer was fraudulent as to the government because it was made for inadequate consideration and left WSCC insolvent. *See* Complaint ¶¶ 116-21; 28 U.S.C. § 3304(a)(1)(A). The Complaint's factual allegations, established as true by the defendants' default, suffice to establish liability under both theories.

A court inquiring into the actual intent of the parties to a transfer alleged to be fraudulent should consider several factors. Among those, the court should take into account whether the

transfer was to an insider, whether the debtor retained possession or control of the property after the transfer, whether the transfer was disclosed or concealed, whether the transfer was of substantially all the debtor's assets, whether the debtor was insolvent or became insolvent shortly after the transfer, and whether the value of the consideration received by the transferring debtor was reasonably equivalent to the value of the transferred assets. 28 U.S.C. § 3304(b)(2).

The sale of WSCC's assets was made to an insider: its longtime secretary, Han. Yun retained control over the Facility by continuing to manage it. Moreover, WSCC's secretary sought to conceal the transfer: as Plössl reported, Han asked him not to tell the Facility's employees about the change in ownership. Moreover, WSCC sold all of its assets in the transfer except for the real property that housed the Facility – and it soon disposed of that as well. In addition, although the government has not presented evidence about the actual value of the transfer of WSCC's assets to WWC, the Complaint does allege, and the defendants' default thus establishes, that WSCC did not receive a reasonably equivalent value in exchange for the assets it sold to WWC. Finally, the defendants' default establishes as true that, as the government alleges, WSCC was left insolvent in 2004 in the aftermath of the transfer (and Yun's representation, in a letter to the EPA following the transfer, that he was unable to pay the remaining penalties owed under the Consent Agreement, provides further support for the same proposition). Having established the foregoing facts in support of its assertion that the transfer was fraudulent as to a debt to the United States, the government is entitled to a finding of liability on each of its claims under the FDCPA. I therefore respectfully recommend that the court grant judgment in the government's favor on those claims, void WSCC's transfer to WWC to the extent necessary to satisfy its debt to the United States, and allow recovery against the transferred assets or any other property of WSCC. 28 U.S.C. § 3306(a).

III.    Recommendation

For the reasons set forth above, I respectfully recommend that the court grant a default judgment in favor of the government against all three defendants, award a total amount of $190,043.05 jointly and severally against all three defendants, and issue an injunction requiring them to bring the subject facility into compliance with all pertinent regulations and to certify such compliance.

IV.    Objections

I direct the plaintiff to serve this Report and Recommendation on each defendant and to file a certificate attesting to such service no later than March 11, 2011. Any objections to this Report and Recommendation must be filed no later than March 28, 2011. Failure to file objections within this period designating the particular issues to be reviewed waives the right to appeal the court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchs. Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

**SO ORDERED.**

Dated: Brooklyn, New York
        March 9, 2011

/s/ James Orenstein
JAMES ORENSTEIN
U.S. Magistrate Judge